# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

**REBECCA LYNNE HARTLOPER,**          )
                                      )
      **Plaintiff,**          )
                                      )
**v.**                                )          **Case No. 10-CV-304-PJC**
                                      )
**MICHAEL J. ASTRUE, Commissioner of the**          )
**Social Security Administration,**          )
                                      )
      **Defendant.**          )

## OPINION AND ORDER

Claimant, Rebecca Lynne Hartloper ("Hartloper"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Hartloper's application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Hartloper appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Hartloper was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Hartloper was 49 when she appeared before the ALJ on May 19, 2008. (R. 28, 35). She testified that she was a high school graduate, that she completed two years of college, and that she had her medical assistant's license. (R. 35). She worked as a pager operator (a person who

answers paged calls) and as a medical assistant at a clinic and doctors office from 1997 to 2002. *Id*. Hartloper testified that she worked as a floral arranger/salesperson from 2002 to 2004. (R. 46-47).

Hartloper testified that on or about February 2, 2004, she no longer had the ability to work. (R. 35). She testified that she had joint pain, primarily in her knees and ankles, but in her fingers and wrists as well. (R. 35-36). She testified that because of her joint pain she had very little strength in her hands and she could not hold a pen for a long period of time. (R. 40). She stated that she could not hold a hammer for more than 20 to 30 minutes on a good day and on a bad day she was unable to hold a hammer at all. (R. 40). While Hartloper previously had bad days only 3 times a week, at the time of the hearing she had bad days 4 or 5 times a week. *Id*. Due to her high level of pain, Hartloper testified that on a bad day she could not tie her shoes, she could not open most containers, she could not brush her hair or bathe, and she could not go to the bathroom by herself. (R. 41-42). She testified that she had to lie down 4 to 5 times per day for 30 to 45 minute periods, or she could not get out of bed at all the next day. (R. 42). She testified that she had to use a walker when it was cold or her joints would flare-up, which occurred 4 to 5 times per month. (R. 40-41).

Hartloper testified that she experienced significant back pain as a result of her fibromyalgia.[1] (R. 36). She testified that she could not sit because of her fibromyalgia, which really affected her "back areas." (R. 42). She stated that she could not tolerate being touched on her shoulders or neck, and her preference was not to be touched at all, even by her clothing. *Id.*

---

[1] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse [not localized] or has multiple trigger points." Dorland's Illustrated Medical Dictionary 711 (31st ed. 1990) (hereafter "Dorland's").

She testified that her retina was damaged as a result of the prescription drug Plaquenil, which she took to manage her lupus.[2] *Id*. She further testified that she had glaucoma[3] and macular degeneration.[4] *Id*. Hartloper stated that as a result of her vision problems she: avoided bright lights; wore sunglasses all the time; could not use a computer; could not read small print; and could no longer drive at night. (R. 36-38). Additionally, she could only read a book or a magazine while wearing glasses (but not for a period longer than 20 minutes or the lines started disappearing and she began to experience headaches). *Id*.

Hartloper testified that her physical capabilities were very limited. (R. 43). She testified that her ability to walk, stand, and sit was greatly restricted. *Id*. On a good day she could only walk half a block, and she could stand for no longer than 20 to 30 minutes at a time. *Id*. She could not sit for a period of time longer than 10 to 15 minutes. *Id*. She testified that she was unable to lift anything heavier than 7 pounds and if she attempted to lift a heavier object she would drop it. *Id*. She stated that her inability to lift more than 7 pounds had existed for the previous 2 years. *Id*.

Hartloper testified that the prescription drugs she took for her pain had negative side-effects, such as: she would lose her train of thought; she was forgetful; she was dizzy; she was sleepy constantly; and she cried frequently. *Id*. Hartloper testified that these side effects made it

---

[2]     Lupus is "destruction or degeneration of the skin caused by cutaneous diseases." Dorland's at 1093.

[3]     Glaucoma is "a group of eye diseases characterized by an increase in intraocular pressure that causes pathologic changes in the optic disk and typical defects in the field of vision." Dorland's at 794.

[4]     Macular degeneration is "degenerative changes in the macula retinae... [and] is the most common cause of blindness in persons over age 65." Dorland's at 487.

difficult to care for herself.  *Id.*   For example, she could no longer get in the shower or drive to

the grocery store by herself if she was taking her medications.  (R. 44).  Hartloper testified that

she: had to give up her job and her pets; and quit pursuing her hobbies, such as cooking,

camping, and fishing.  (R. 44-45).  Hartloper stated that she would be unable to sit for 6 hours

during an 8 hour work day and unable to stay on task during the work day.  (R. 45).

The administrative record showed that Hartloper was first seen at Berkshire Family

Practice on January 27, 2004, by Dr. Bennett, D.O., P.C.  (R. 293).  Hartloper's chief complaints

were joint pain, stiffness, and discomfort in her feet.  *Id.*  Dr. Bennett suggested the use of

support shoes at all times, and she provided Hartloper with an exercise guide.  *Id.*  At an

appointment with Dr. Bennett on February 19, 2004, Hartloper's chief complaints were leg

cramps, joint pain, and stiffness.  (R. 291).  Dr. Bennett recommended the use of orthotic shoes

and referred Hartloper to Dr. Crotty, a podiatrist.  *Id.*  On March 26, 2004, Hartloper was

examined by Dr. Bennett, and her chief complaints were that her back, skin, and muscles hurt;

her right ankle was numb; and it hurt to pick up heavy objects.  (R. 290).  Dr. Bennett noted that

Hartloper's feet were not any better, her eyes were clear, and she had a gel phenomenon[5]

condition.  *Id.*  Dr. Bennett's treatment plan included prescribing Lortab for Hartloper's chronic

pain.  *Id.*  At an appointment with Dr. Bennett on May 7, 2004, Hartloper complained of joint

pain and stiffness.  (R. 288).  Dr. Bennett commented that Hartloper had varicose veins,[6] a sacral

---

[5]      Gel phenomenon is "stiffness brought on by periods of rest, lasting minutes rather than
hours . . . [gel] phenomenon is common with noninflammatory conditions such as . . .
fibromyalgia."  Rheumatology Diagnosis and Therapeutics 6 (2d ed. 2005).

[6]      Varicose vein is "a dilated tortuous vein, usually in the subcutaneous tissues of the leg."
Dorland's at 2065.

base abnormality,[7] chronic lower back pain, and muscle spasms. *Id.* Dr. Bennett refilled Hartloper's prescription for Lortab. *Id.*

On May 25, 2004, Hartloper's chief complaints were joint pain, stiffness, and nodules[8] on her right hand and tail bone. (R. 286). On examination, Hartloper had: a good range of motion in her hands; spurring that was palpated over the right dorsum[9] of her hand without tenderness; and bruising on the dorsum of her left hand. (R. 287). *Id.* Dr. Bennett also noted that Hartloper had no focal deficits[10] and that her insight and memory were within normal levels. *Id.* On June 18, 2004, Hartloper's chief complaints were joint pain and stiffness; however, she indicated that her overall pain was better. (R. 284). Dr. Bennett diagnosed Hartloper with chronic pain syndrome. *Id.* Dr. Bennett's treatment plan for Hartloper included the continued use of OxyContin for pain. *Id.* Hartloper's other chief complaints were that she had trouble retrieving the names of things and remembering words. *Id.* However, Dr. Bennett's examination indicated that Hartloper's alertness, orientation, insightfulness, and memory were all normal. *Id.*

On July 9, 2004, Hartloper complained to Dr. Bennett that her legs and arms hurt. (R. 283). Hartloper stated that the pain was better when she was active, but that she still had to take her pain medication. *Id.* Dr. Bennett noted that Hartloper tested positive for 18 out of 18 fibromyalgia tender points, which indicated she had fibromyalgia; and that Hartloper continued

---

[7]     Sacral base abnormality is an abnormality in the sacrum. The sacrum is "the triangular bone just below the lumbar vertebrae." Dorland's at 1687.

[8]     Nodule is "a small mass of tissue in the form of a swelling, knot, or protuberance, either normal or pathological." Dorland's at 1298.

[9]     Dorsum is "the aspect of an anatomical part or structure corresponding in position to the back." Dorland's at 570.

[10]     Focal deficit means a lack of focus. Dorland's at 485, 731.

to suffer from a gel phenomenon.  *Id*.  Dr. Bennett's treatment plan included the continued use of Lortab, OxyContin, Vioxx, and Robitussin.  *Id*.  Dr. Bennett further commented that Hartloper had diffuse symmetrical arthritis[11] and muscle spasms, for which Dr. Bennett prescribed OxyContin and Zaneflex.  *Id*.  Lastly, Dr. Bennett commented on the need to manage Hartloper's depression by the use of medication, and it appears that she began prescribing Hartloper medication for her depression.  *Id*.

On August 13, 2004, Hartloper's chief complaints were joint pain, stiffness, and chronic pain.  (R. 282).  Hartloper indicated to Dr. Bennett that: her pain was better when she was active; she still continued to paint; she was currently painting a large house; and she had 7 other houses waiting to be painted.  *Id*.  Dr. Bennett continued to treat Hartloper's constant pain through the use of prescription medication.  *Id*.  On September 30, 2004, Hartloper's chief complaints were muscle and joint pain.  (R. 280).  Hartloper stated that she wore an ankle brace and that she could walk, but only if she "hunched over."  *Id*.  Hartloper stated that her pain was worse if she remained inactive.  *Id*.  Dr. Bennett's notes included the continued treatment of Hartloper's joint pain, back pain, and fibromyalgia.  *Id*.

On November 9, 2004, Hartloper's chief complaints were joint pain, stiffness, and a swollen thumb.  (R. 278).  Hartloper stated that her pain was worse when she was still, but that her pain was better if she was working.  *Id*.  She stated that she started work on a new house and her "work activity was fairly good."  *Id*.  Dr. Bennett's treatment plan included the continued use of OxyContin for pain management, especially for her swollen thumb, which Dr. Bennett

---

[11]      Diffuse arthritis is arthritis (inflamation of a joint) that is  "not definitely limited or localized."  Dorland's at 152, 524.

indicated was the result of gout[12] or "pseudogout." (R. 279). On December 6, 2004, Hartloper was examined by Dr. Bennett at SouthCreek Family Medicine. (R. 277). Hartloper's chief complaints were pain in her right hand and a swollen finger. *Id*. Hartloper stated that she hauled water and made repairs in her basement. *Id*.

On February 15, 2005, Hartloper's chief complaint was fatigue. (R. 275). She stated that she could not stay awake, get up, or cook, and she was exhausted all the time, which required her to lie down every 2 hours. *Id*. Hartloper's other complaint was that she had a problem with her memory. *Id*. Hartloper stated that she would occasionally forget where she put things, would put things in odd places, and would lose sense of time occasionally. *Id*. Dr. Bennett's examination indicated that Hartloper's alertness, orientation, insight, and memory were all within the normal range. *Id*. Dr. Bennett prescribed Xanax to Hartloper to help her deal with her situational anxiety, which was associated with her husband's health problems. (R. 276).

On April 12, 2005, Hartloper was examined by Dr. Lawrence A. Jacobs, M.D., at Rheumatology Associates. (R. 216-18). Dr. Jacobs' physical examination indicated that Hartloper was a healthy but very anxious person. (R. 217). Dr. Jacobs assessed the following about Hartloper: she had a decreased range of motion of both the cervical and lumbar spine; she had mild tenderness over the lumbar spine, but straight leg raising yielded only hamstring tightness; and the small joints of Hartloper's hands showed tenderness but there was no actual

---

[12]    Gout is "a group of disorders of purine metabolism, manifested by various combinations of (1) hyperuricemia; (2) recurrent acute inflammatory arthritis induced by crystals of monosodium urate monohydrate; (3) tophaceous deposits of these crystals in and around the joints of the extremities, which may lead to crippling destruction of joints; and (4) uric acid urolithiasis."  Dorland's at 811.

synovitis.[13]  *Id.*  He also noted very small Heberden's nodes[14] and some increased nail fold vascularity.[15]  *Id.*  Dr. Jacobs' examination further revealed that Hartloper's elbows were unremarkable and that her shoulders showed a mild decreased range of motion.  *Id.*  Hartloper had a good range of motion at the hips and knees, although her right knee appeared swollen; she had tenderness in her hips; she had prominent metatarsalgia,[16] ankle pronation, and pes planus deformity;[17] and her ankles were swollen.  *Id.*  Hartloper was positive for only 6 of the 18 prescribed fibromyalgia tender points.  (R. 218).  Dr. Jacobs noted that there was no localized sensory or motor deficit.  *Id.*  Dr. Jacobs' diagnoses were: diffuse arthralgia[18] with swelling of the

---

[13]  Synovitis is "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion with within a synovial sac." Dorland's at 1879.

[14]  Heberden's nodes are "small hard nodules, formed usually at the distal interphalangeal articulations of the fingers, produced by calcific spurs of the articular cartilage and associated with interphalangeal osteoarthritis."  Dorland's at 1299.

[15]  Nail folds vascularity refers to the nail fold ("the edge of the skin which overlaps the nail at its sides and at the root,") being well supplied with arteries and veins.  V.4-N, 6;V.6-V, 35, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender) (hereafter "Attorneys' Dictionary").

[16]  Metatarsalgia is "pain and tenderness in the metatarsal region ['the part of the foot between the tarsus and the toes.']"  Dorland's at 1162.

[17]  Pes planus refers to a foot that is flatfoot.  Dorland's at 1441.

[18]  Arthralgia is "pain in a joint."  Dorland's at 152.

right knee; possible rheumatoid arthritis;[19] systemic lupus erythematosus ("SLE");[20] and lumbosacral disc disease. *Id*. The treatment plan Dr. Jacobs recommended included a trial of Diclofenac and a follow up visit. *Id*.

At an appointment with Dr. Bennett on May 12, 2005, Hartloper's chief complaints were the presence of a mole, joint pain, fatigue, and stiffness. (R. 274). Dr. Bennett's treatment plan included an adjustment to Hartloper's OxyContin. *Id*. Dr. Bennett indicated that Hartloper would benefit from domestic help at home. *Id*. On May 23, 2005, Hartloper was examined by Dr. Jacobs at Rheumatology Associates. (R. 214). Hartloper's right upper extremity, left knee, and her continued fatigue were her chief complaints. *Id*. Dr. Jacobs diagnosed Hartloper with antinuclear antibody ("ANA"),[21] arthralgias, and fatigue. *Id*. Dr. Jacobs questioned whether Hartloper had systemic rheumatic disease.[22] *Id*. Dr. Jacobs' treatment plan included the use of

---

[19]    Rheumatoid arthritis is a "chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. In late stages deformity and ankylosis develop. The cause is unknown, but autoimmune mechanisms and virus infection have been postulated." Dorland's at 152, 159.

[20]    SLE stands for systemic lupus erythematosus which is "a chronic, inflammatory, often febrile multisystemic disorder of connective tissue that proceeds through remissions and relapses; it may be either acute or insidious in onset and is characterized principally by involvement of the skin . . . joints, kidneys and serosal membranes. The etiology is unknown, but it may be a failure of regulatory mechanisms of the autoimmune system, since there are high levels of numerous autoantibodies against nuclear and cytoplasmic cellular components. The condition is marked by a wide variety of abnormalities, including arthritis, arthralgias, nephritis, [and] central nervous system manifestations." Dorland's at 1095.

[21]    ANA is the acronym for antinuclear antibody, which means "destructive to or reactive with components of the cell nucleus." Dorland's at 109.

[22]    Rheumatic disease is a "popular name for any of a variety of disorders marked by inflamation, degeneration, or metabolic derangement of connective tissue structures of the body, especially the joints and related structures, including muscles, bursae, tendons, and fibrous tissue, with pain, stiffness, or limitation of motion." Dorland's at 1663.

Plaquenil.  *Id.*  On June 16, 2005, Hartloper had an atypical mole removed by Dr. Bennett.  (R. 271).

On August 1, 2005, Hartloper was examined at Oklahoma Heart Institute.  (R. 185).  The examining physician commented that Hartloper had varicose veins in her medial knee and calf. (R. 187).  On August 2, 2005, Hartloper was examined by Dr. Bennett, and her chief complaint was pain in her leg caused by a sore.  (R. 270).  Hartloper stated that the pain in her leg had started one month earlier and that it caused a throbbing pain.  *Id.*  Hartloper stated that her mobility was not completely limited, in that she had recently been able to sit up for an hour-and-a-half and she was able to use a weedeater.  *Id.*  At an appointment with Dr. Bennett on August 10, 2005,  Hartloper stated that the sore on her leg was much better and that her pain medications kept her functional.  (R. 269).  Hartloper's chief complaint was that her left eye hurt when she sucked on a straw.  *Id.*  Dr. Bennett diagnosed Hartloper with subconjunctival hemorrhage[23] in her left eye, but indicated that there was no trauma to her left eye.  *Id.*  Dr. Bennett advised Hartloper to see an ophthalmologist.  *Id.*

Also on August 10, 2005, Hartloper was examined by Dr. Kent Medcalf at Eyecare Associates of South Tulsa.  (R. 199).  In a questionnaire, Hartloper indicated that it was bothersome for her to read small print and to do fine eye-hand coordination tasks, even with her glasses on.  (R. 198).  Hartloper stated that with her glasses on she had no problem seeing faces at a distance, reading traffic signs, or watching television.  *Id.*  Hartloper, in the questionnaire, indicated that she suffered from eye pain and soreness.  *Id.*  Dr. Medcalf's examination revealed

---

[23]     Subconjunctival hemorrhage is a mass or localized collection of blood situated under the conjunctiva, the delicate membrane which covers the front party of the eyeball.  V. 3-H, 58; V.5-2, 339,  *Attorneys' Dictionary*.

that Hartloper's pupils were equal and reactive; extraocular motility[24] was full; her intraocular pressure was 14, which was normal;[25] and her visual acuity was 20/20. (R. 199). Dr. Medcalf's impression was that Hartloper had episcleritis,[26] eye pain, and conjunctiva hyperemia[27] in her left eye; and age-related macular degeneration in both her eyes. *Id.* Dr. Medcalf's treatment plan was for Hartloper to begin using Zybrom in her left eye. *Id.* On August 19, 2005, Hartloper was again examined by Dr. Kent Medcalf. (R. 189). Dr. Medcalf indicated that Hartloper's condition had improved. (R. 190).

On April 3, 2006, Hartloper was examined by James F. Ronk, M.D., at Tulsa Eye Associates. (R. 206). Dr. Ronk's diagnoses were that Hartloper had mild, early dry age-related macular degeneration in both eyes; posterior vitreous separation[28] in her left eye; and that Hartloper needed to be tracked for possible development of glaucoma because she had borderline intraocular pressure in her left eye. *Id.* Dr. Ronk's treatment plan included Hartloper wearing sunglasses and taking a daily antioxidant vitamin. *Id.*

---

[24]    Extraocular motility is simply the movement of the eyeball, in the eye socket, by the extraocular muscles. Dorland's at 672, 1201.

[25]    Intraocular pressure is "the pressure of the fluids of the eye against the tunics. It is produced by continual renewal of the fluids within the interior of the eye, and is altered in certain pathological conditions (e.g., glaucoma). It may be roughly estimated by palpation of the eye or measured, directly or indirectly, with specially devised instruments called tonometers." Dorland's at 1535.

[26]    Episcleritis is "inflammation of the episclera and adjacent tissues; it may be confined to a sector or diffuse, and is usually idiopathic and self-limited. Visual acuity is usually normal." Dorland's. at 642.

[27]    *See* "subconjunctival hemmorage"*supra* at n. 24.

[28]    Posterior vitreous separation is "a condition of the eye in which the vitreous humor separates from the retina." Dorland's at 2098.

On April 18, 2006, Hartloper was examined by Dr. Jacobs at Rheumatology Associates. (R. 208-09).  Dr. Jacobs noted that Hartloper in either October or November, 2005, experienced decreased vision and subsequently stopped taking her prescription Plaquenil.  (R. 208).  Dr. Jacobs' examination revealed that Hartloper experienced tenderness without clear cut synovitis involving the small joints of the hands and wrists.  (R. 209).  Dr. Jacobs also noted that there was tenderness at Hartloper's shoulders; her knees were tender; and Hartloper experienced pain on movement of her knees.  *Id*.  Dr. Jacobs' treatment plan was for Hartloper to briefly use Prednisone.  *Id*.

On May 19, 2006, Hartloper was examined by Dr. Ronk in a follow up visit.  (R. 202). Dr. Ronk's examination indicated mild peripheral vision loss in Hartloper's right eye, marked peripheral vision loss in her left eye, and a contraction of her vision field.  *Id*.  Dr. Ronk indicated these results were consistent with glaucoma.  *Id*.  Dr. Ronk prescribed eye drops.  *Id*.

On May 30, 2006, Hartloper was examined again by Dr. Jacobs at Rheumatology Associates.  (R. 207).  Dr. Jacobs commented that much of Hartloper's musculosketetal symptoms were resolved, although Dr. Jacobs noted that Hartloper still stated that she was having difficulty sleeping and she was "wired."  *Id*.

On June 22, 2006, agency consultant Dr. Steven Y. M. Lee, M.D., examined Hartloper. (R. 222).  Dr. Lee indicated that he was unable to perform tests to determine Hartloper's passive range of motion, because Hartloper was concerned the examination might cause her pain.  *Id*. Therefore, Dr. Lee's assessment was made primarily through observation, and he believed that Hartloper's hip flexion, knee flexion, and elbow flexion did not cause her pain.  (R. 222-24).  Dr. Lee, by palpation and inspection, was unable to find swelling, deformity, or tenderness in

Hartloper's wrists, elbows, knees, ankles, or feet. (R. 223). A musculoskeletal examination revealed no tenderness over spinous processes,[29] sacrum, sacroiliac joints, or costovertebral angles.[30] *Id*. Flexion, extension, and lateral bending of the back were not performed, because Hartloper stated she could not stand without help. *Id*. Neurologically, Hartloper was alert and oriented to time, place, and person. *Id*. Dr. Lee indicated that Hartloper had normal sensation to pin pricks. *Id*. Dr. Lee commented that Hartloper stated she could not walk without her walker, but he observed her standing without support for a short period of time. *Id*. In an August 11, 2006, letter, Dr. Lee indicated that Hartloper had no trouble using her hands, even though Hartloper claimed she did have difficulty using her hands. (R. 247).

At an appointment with Dr. Jacobs on September 5, 2006, Hartloper stated that she was doing well in terms of her musculoskeletal pain. (R. 249). On September 9, 2006, diagnostic imaging revealed that Hartloper had mild medial joint space narrowing bilaterally[31] and small patellar osteophytes (bone spurs) bilaterally in her knees. (R. 253). Diagnostic imaging also revealed Hartloper's hip joint structures to be intact, without evidence of fractures, dislocations, or significant degenerative changes. (R. 254). Diagnostic imaging of Hartloper's spine revealed that Hartloper had facet arthrosis at L5-S1, atherosclerotic vascular disease,[32] and "questionable"

[29]    Spinous processes is "a part of the vertebra projecting backward from the arch, giving attachment to muscles of the back." Dorland's at 1543.

[30]    Costovertebral angle is "the angle formed on either side of the vertebral column, between the last rib and the lumbar vertebrae." Dorland's at 89.

[31]    Medial joint space narrowing bilaterally means that the joints in her knees closer to the inside of her legs were narrowing. V. 4-M, 85, *Attorneys' Dictionary*.

[32]    Atherosclerosis vascular disease is "a common form of arteriosclerosis with formation of deposits of yellowish plaques (atheromas) containing cholesterol, lipoid material, and lipophages in the intima and inner media of large and medium-sized arteries." Dorland's at 174.

renal calculi.[33]  (R. 255).

On November 1, 2006, an echocardiogram was performed at Oklahoma Heart Institute, and it showed that all of Hartloper's valves were structurally and functionally normal.  (R. 294-95).

On November 3, 2006, Dr. Bennett signed a "To Whom It May Concern" letter stating that Hartloper had "multiple medical problems and is unable to work."  (R. 331).  She recounted that Hartloper had SLE "with Anticardiolipin/Antiphospholipid Antibody."  *Id.*  Hartloper had superficial blood clots in her legs that caused "considerable pain," and due to the clots and the Anticardiolipin Antibody, Hartloper had been treated with Coumadin anticoagulation.  *Id.*  Dr. Bennett stated that the pain caused Hartloper's lupus required strong opiate medications and "disease modifying anti-rheumatic drugs."  *Id.*  She said that the combination of the anti-rheumatic drugs and the anticoagulation therapy could cause serious gastrointestinal disorders.  *Id.*  Dr. Christy pointed out that Hartloper's fibromyalgia and other diagnosed conditions caused pain.  *Id.*  She also recited that Hartloper had been diagnosed with dry macular degeneration, and that there were concerns that she might loser her vision if the condition continued "on a rapid course."  *Id.*  She noted that Hartloper was also a "glaucoma suspect."  *Id.*  Dr. Bennett concluded her letter by stating that she did not foresee Hartloper being able to resume employment.  *Id.*

On December 4, 2006, Hartloper was examined by Dr. Jacobs at Rheumatology Associates.  (R. 297).  Hartloper stated that she had been more fatigued and experienced

---

[33]     Renal calculi is "inflammation of the kidney; a focal or diffuse proliferative or destructive process that may involve the glomerulus, tubule, or interstitial renal tissue."  Dorland's at 1259.

increased pain before the appointment.  *Id*.  She was having more pain in her right ankle and left knee.  *Id*.  Dr. Jacobs' examination revealed that the small joints of Hartloper's hands, wrists, elbows, and shoulders showed only slight tenderness; there was trace swelling in Hartloper's left knee; and there was very definite tenderness in Hartloper's right ankle.  *Id*.

On December 6, 2006, Hartloper was examined by Dr. Bennett.  (R. 301).  Hartloper stated that the cold weather affected her joints, that her right ankle was severely affected by the cold, and that the OxyContin no longer worked as well as it had in the past.  *Id*.  Dr. Bennett's examination revealed that Hartloper's right ankle was very swollen and tender, as a result of her SLE and diffuse arthritis.  *Id*.

On January 9, 2007, Hartloper saw Dr. Bennett, and her chief complaints were vision changes, joint pain, stiffness, and fatigue.  (R. 299).  Hartloper indicated that she was worried and that she felt like she was dying.  *Id*.  On March 13, 2007, Hartloper saw Dr. Jacobs, and her chief complaints were increased pain in both of her knees and the small joints of her hands; and an increase in fatigue.  (R. 305-06).  Hartloper stated that it was particularly painful for her to get out of chairs.  (R. 305).  Dr. Jacobs' examination indicated that there was diffuse erythema[34] over Hartloper's face, chest, arms, and hands.  *Id*.  There was very mild swelling involving Hartloper's proximal interphalangeal joints in her hands and her metacarpophalangeal joints in her fingers, and there was definite swelling in Hartloper's knees.  *Id*.  Dr. Jacobs' diagnoses were that Hartloper continued to suffer from SLE with increased musculoskeletal symptoms, and she had developed a rash.  *Id*.

---

[34]      Erythema is "redness of the skin produced by congestion of the capillaries."  Dorland's at 650.

On September 4, 2007, Dr. William Surbeck, M.D., evaluated Hartloper. (R. 313). Dr. Surbeck ordered tests to check for lupus and antiphospholipid antibodies. (R. 314). The pathology report showed the presence of a lupus anticoagulant.[35] (R. 326). On December 27, 2007, on a follow up visit to Dr. Surbeck, Hartloper's chief complaint was that her right knee was painful and that it gave way occasionally. (R. 313). Dr. Surbeck's examination revealed that there was no synovitis in Hartloper's hands, wrists, elbows, shoulders, knees, or ankles. *Id*. Dr. Surbeck stated that Hartloper had mild tenderness in her right knee. *Id*.

On May 7, 2008, Dr. Corey Schoenewe completed a Physical Medical Source Statement Form. (R. 333-35). Dr. Schoenewe indicated the following: Hartloper could only sit, stand, and walk for 1 hour at a time during an 8 hour work day; she could sit or stand for only 2 hours total during an entire 8 hour work day; and she could walk for only 1 hour total during the entirety of the work day. (R. 333). Dr. Schoenewe's examination further indicated that Hartloper could occasionally lift up to 5 pounds; she could not carry any amount of weight; she could not use her feet, hands or fingers for activities involving repetitive movements; she was unable to squat, crawl, or climb; and she could only occasionally bend or reach. (R. 333-34). Dr. Schoenewe provided the following objective medical findings to support his conclusions: Hartloper's wrists had a limited range of motion, and Hartloper experienced pain when bending her wrists; Hartloper had limited range of motion in her right fourth, left third, and left fourth fingers; she had a limited range of motion in both her ankles, and she experienced pain when bending her ankles; she had decreased grip strength in her right hand; she had bilateral pes planus and severe

---

[35]    Lupus anticoagulant is "a circulating anticoagulant that inhibits the conversion of prothrombin to thrombin, found in 5-10 per cent of patients with systemic lupus erythematosus, but also seen in other disorders." Dorland's at 103-04.

plantar fascial pains; and she showed displays of painful movement at all major and minor joints. (R. 334). Lastly, Dr. Schoenewe concluded that given Hartloper's physical findings, her previous diagnoses, and her macular degeneration, his professional opinion was that Hartloper was unemployable. (R. 335).

On September 9, 2006, agency nonexamining consultant Dr. Luther Woodcock completed a Physical Residual Functional Capacity Assessment. (R. 256-63). Dr. Woodcock indicated that Hartloper could occasionally lift and/or carry 10 pounds and could frequently lift and/or carry less than 10 pounds. (R. 257). Dr. Woodcock indicated that Hartloper could stand and/or walk for at least 2 hours in an 8 hour workday and she could sit, with normal breaks, for a total of about 6 hours in an 8 hour workday. *Id*. Dr. Woodcock also noted that Hartloper's ability to push and/or pull was not limited. *Id*. Dr. Woodcock concluded that Hartloper's strength was "okay" and that she had a limited range of motion in her back, hips, and knees. *Id*. Hartloper's vision was 20/20 in her right eye and 20/40 in her left eye. *Id*. Dr. Woodcock concluded that Hartloper had no postural, manipulative, visual, communicative, or environmental limitations. (R. 258-60).

On March 22, 2007, agency nonexamining consultant Kenneth Wainner, MD, endorsed a Case Analysis which affirmed the determination of Dr. Woodcock and additionally stated that Hartloper had SLE and antiphospholipid syndrome. (R. 310). Dr. Wainner noted that Hartloper had a recent "ankle flare" after being much better in her rheumatologist's office back in September, 2006 (referring to Dr. Jacobs' examination). *Id*. Dr. Wainner noted that Hartloper stated she was going blind and had some personal care problems with her buttons; however, she was still able to drive, shop, sweep, rake yards, lift objects, and walk. *Id*. Dr. Wainner further

noted that Hartloper's x-rays were "quite unspectacular," that her hips were narrowed bilaterally, and that she had mild joint space narrowing in her knees, which was probably better than average for her age. *Id*. In addition, Dr. Wainner stated that Hartloper was clearly not engaging in less than sedentary activities. *Id*.

On July 6, 2006, agency nonexamining consultant Dr. Cynthia Kampschaefer completed a Psychiatric Review Technique form. (R. 232-42). Dr. Kampschaefer indicated that Hartloper's medically determinable mental impairments were not "severe." *Id*. Dr. Kampschaefer noted Hartloper's depressive syndrome for Listing 12.04. (R. 235). For the "Paragraph B Criteria,"[36] Dr. Kampschaefer found that Hartloper had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation. (R. 242). Dr. Kampschaefer also noted that most of Hartloper's mental allegations stemmed from her lupus and that Hartloper met the requirements of Listing 14.02A (referencing 20 C.F.R. Pt. 404. Subpt. P, App 1). (R. 244). On March 22, 2007, Dr. Varghese, M.D., an additional agency nonexamining consultant, affirmed the determination of Dr. Kampschaefer. (R. 311).

On August 15, 2006, Dr. Woodcock indicated that the requirements of Listing 14.02A had not been satisfied because the limitations of Hartloper's joints were not documented to the severity required in the Listing. (R. 248). Dr. Woodcock seemed to base this opinion on the fact

---

[36] There are broad categories known as the "Paragraph B Criteria" of the Listings of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-1269 (10th Cir. 2008)

that Dr. Jacobs did not report any synovitis or tenderness of Hartloper's joints; nor did Dr. Jacobs comment on the use of Hartloper's hands or her need for a walker. *Id*. It further appears that Dr. Woodcock relied on the report by Dr. Lee, which indicated that Dr. Lee felt that Hartloper had normal use of her hands and that she might not need to use a walker. *Id*.

## Procedural History

Hartloper filed an application on May 31, 2006 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 102-06). The application was denied initially and on reconsideration. (R. 54-58, 67-69). A hearing before ALJ Lantz McClain was held May 19, 2008, in Tulsa, Oklahoma. (R. 23, 77). By decision dated July 25, 2008, the ALJ found that Hartloper was not disabled at any time from her alleged onset date through her date last insured. (R. 15-23). On January 28, 2010, the Appeals Council denied review of the ALJ's findings. (R. 6-9). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a

disability claim. 20 C.F.R. § 404.1520.[37]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th

Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is

or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at

750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id*.  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever the record fairly detracts from its

weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

---

[37]     Step One requires claimant to establish that she is not engaged in substantial gainful
activity, as defined by 20 C.F.R. § 404.151.  Step Two requires that the claimant establish that
she has a medically severe impairment or combination of impairments that significantly limit her
ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in
substantial gainful activity (Step One) or if the claimant's impairment is not medically severe
(Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared
with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant
suffering from a listed impairment or impairments "medically equivalent" to a listed impairment
is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four,
where the claimant must establish that she does not retain the residual functional capacity
("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden
shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the
national economy which the claimant, taking into account her age, education, work experience,
and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability
benefits are denied if  the Commissioner shows that the impairment which precluded  the
performance of the past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Hamlin*, 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Hartloper's date last insured was March 31, 2008. (R. 17). At Step One, the ALJ found Hartloper had not engaged in substantial gainful activity during the period from her alleged onset date of February 2, 2004, through March 31, 2008. *Id*. At Step Two, the ALJ found that Hartloper had severe impairments of "degenerative disc disease, atherosclerotic disease, lupus, antiphospholipid syndrome, degenerative joint disease, hammer toes, heel spurs, and obesity." *Id*. The ALJ discussed Hartloper's allegation that she had glaucoma and macular degeneration. *Id*. The ALJ found that Hartloper's "visual acuity was 20/20 and there was no reported vision loss." *Id*. While the ALJ noted that Dr. Ronk had indicated that Hartloper was a suspect for glaucoma, the ALJ found that Hartloper's visual impairments were not "severe," because medical and other evidence established "only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." *Id*. The ALJ discussed Hartloper's allegation of fibromyalgia. *Id*. While the ALJ noted that a tender point examination for fibromyalgia was positive for 6 of the 18 prescribed tender points, the ALJ found that Hartloper's fibromyalgia was a "medically non-determinable impairment," because it was not established by any evidence in the record. (R. 18). The ALJ discussed Hartloper's allegation of depression and anxiety. *Id*. The ALJ considered the Paragraph B Criteria, and found that Hartloper's depression and anxiety did not cause more than minimal limitation, since there were "no records indicating hospitalization, counseling, or psychiatric care for mental issues," and, since Hartloper did not discuss her difficulties with "concentration, coherency, or understanding with her physicians." *Id*.

At Step Three, the ALJ found that Hartloper's impairments did not meet a Listing. (R. 18-19). The ALJ determined that Hartloper had the RFC to perform the "full range of sedentary work as defined in 20 C.F.R.§ 404.1567(b)."[38] *Id.* The ALJ further stated that Hartloper was able to "occasionally lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for at least 2 hours out of an 8-hour workday (with normal breaks), and sit at least 6 hours out of an 8-hour workday (with normal breaks)." *Id.* At Step Four, the ALJ found that Hartloper was capable of performing her past work as a pager operator. (R. 22). Therefore, the ALJ found that Hartloper was not disabled from February 2, 2004, through March 31, 2008, her date last insured. *Id.*

## Review

Hartloper makes several arguments, but the Court addresses only the failure of the ALJ to discuss the evidence supporting Hartloper's assertion that she suffered from glaucoma and macular degeneration when the ALJ made his RFC determination. The Court finds that reversal is required, because the ALJ failed to consider evidence favorable to Hartloper's claim regarding her alleged glaucoma and macular degeneration when making his RFC assessment.

The ALJ must consider all the impairments documented in the record throughout the disability process. *Carpenter*, 537 F.3d at 1265-66; *see also* 20 C.F.R. § 404.1523 ("[T]he combined impact of the [claimant's] impairments will be considered throughout the disability [process]"). The ALJ is "obligated to consider all limitations, severe and non-severe, throughout the five-step sequential process, including the RFC determination." *Groberg v. Astrue,* 2011 WL

---

[38]     Sedentary work is work that "involves lifting no more than 10 pounds at a time . . . a sedentary job is defined as one which involves sitting [but] a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

538870 (10th Cir.) (unpublished) (emphasis omitted); *see also* 20 C.F.R. § 1545(a)(2) ("We will

consider all of your medically determinable impairments of which we are aware, including your

medically determinable impairments that are not 'severe' . . . when we assess your [RFC].").

It is law in this circuit that an ALJ must discuss more than just the evidence favorable to

an opinion that a claimant is not disabled: "in addition to discussing the evidence supporting his

decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as

well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th

Cir. 1996). It is error to ignore evidence that would support a finding of disability while

highlighting the evidence that favors a finding of non-disability. *Frantz v. Astrue*, 509 F.3d 1299,

1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial

review, and, therefore, an ALJ is required to discuss the evidence and give reasons for his

conclusions. *Clifton*, 79 F.3d at 1009.

The ALJ discussed Hartloper's claims of glaucoma and macular degeneration at Step

Two[39] and determined that the medical records did not support Hartloper's claims that her

glaucoma and macular degeneration were severe. (R. 17-18). In explanation of this statement,

the ALJ cited to the medical records of "Dr. Ronk"[40] from August 10, 2005, in which the doctor

---

[39]    It is well-settled law in this circuit that any error at Step Two is harmless so long as the
ALJ finds at least one condition to be severe, so that the five-step sequential evaluation
continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure
to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two);
*Carpenter*, 537 F.3d at 1266 (any error at Step Two was harmless when ALJ properly proceeded
to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at
Step Two, there was no reversible error at this step. The error was in failing to consider all of the
evidence supporting Hartloper's claims regarding her vision problems, and this failure affected
the ALJ's RFC determination.

[40]    The ALJ credits Dr. Ronk, but the signing physician on the report was  Dr. Medcalf.  (R.
199).

diagnosed Hartloper with possible glaucoma and macular degeneration. (R. 206). The doctor also noted that Hartloper's visual acuity was 20/20 in both her eyes, that her intraocular pressure was 14 in both her eyes, and that she had no marked vision loss. (R. 206). The ALJ's discussion was inadequate because he only cited to the August 2005 examination, and he ignored later medical evidence that supported Hartloper's claim. On April 3, 2006, Dr. Ronk noted that Hartloper needed to be tracked for possible development of glaucoma because she had borderline intraocular pressure in her left eye. *Id*. On May 19, 2006, Dr. Ronk's examination revealed marked peripheral vision loss in Hartloper's left eye and a contraction of her vision field, and Dr. Ronk stated that these symptoms were consistent with glaucoma. (R. 202). Dr. Bennett's November 2006 letter also made references to both of these conditions, including the "rapid course" of the dry macular degeneration. (R. 331).

The ALJ had a duty to discuss this evidence in more detail than dismissing the Hartloper's visual impairments at Step Two because the ALJ characterized them as not "severe." The ALJ must consider the evidence throughout the disability determination process. The ALJ may not simply ignore medical evidence found in the administrative record. *See Carpenter*, 537 F.3d at 1266-1269 (ALJ erred when he did not discuss considerable evidence of claimant's prior neck injuries). The court in *Carpenter* explained that the ALJ's Step Five analysis was "undercut by his failure to discuss the evidence in [the claimant's] favor at preceding steps." Here, the ALJ's failure to acknowledge or reflect on the medical evidence found in the administrative record that supported Hartloper's claims regarding glaucoma and macular degeneration requires that the decision by reversed and remanded.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.

*Thompson v. Sullivan*, 987 F.2d 1482, 1492-1493 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1028, 1213-1214 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F. 2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to Hartloper's visual impairments required reversal, the undersigned does not address the other contentions raised by Hartloper. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Hartloper.

Conclusion

Based on the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Hartloper for further proceedings consistent with this Order.

Dated this 14th day of June, 2011.

Paul J. Cleary
United States Magistrate Judge